L.I. HEAD START CHILD DEVELOP-
MENT SERVICES, INC., Paul
Adams, derivatively on behalf of Com-
munity Action Agencies Insurance
Group and as class representative of
all other persons similarly situated,
Plaintiffs,

v.

ECONOMIC OPPORTUNITY COM-
MISSION OF NASSAU COUNTY,
INC., Economic Opportunity Council
of Suffolk, Inc., Yonkers Community
Action Program, Inc., and Stella B.
Kearse as Representative of the Es-
tate of John L. Kearse, Deceased, De-
fendants.

No. CV 00–7394 (ADS).

United States District Court,
E.D. New York.

July 8, 2009.

Welby, Brandy & Greenblatt, LLP, by Alexander A. Miuccio, Esq., of Counsel, White Plains, NY, for Plaintiffs.

Mark E. Goidell, Esq., Hauppauge, NY, for the Defendants Economic Opportunity Commission of Nassau County, Inc. and Yonkers Community Action Program Inc.

Barry V. Pittman, Esq., Bay Shore, NY, for Defendant Economic Opportunity Council of Suffolk, Inc.

Law Offices of Frederick K. Brewington, by Frederick K. Brewington, Esq. and Eric M. Sarver, Esq., of Counsel, for Defendant Stella B. Kearse as Representative of the Estate of John L. Kearse, Deceased.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This is Chapter III in this interesting interchange between the plaintiff L.I. Head Start Child Development Services, Inc., ("L.I. Head Start"), an employee health and welfare benefit fund and five former associates. These former associates are first, Community Action Agencies Insurance Group ("CAAIG"), a not-for-profit, anti-poverty, tax exempt organization which provided health benefits to its participants who were minorities and low and middle income persons and families. The second, third and fourth former associates of the plaintiffs were all participating organizations in CAAIG, whose members were beneficiaries of the health benefits. They are the Economic Opportunity Commission of Nassau County, Inc. ("EOC Nassau"); the Economic Opportunity Council of Suffolk County, Inc. ("EOC Suffolk"); and the Yonkers Community Action Program, Inc. ("Yonkers CAP"). The fifth and final associate is an individual, namely, John L. Kearse, who was a Trustee and Administrator of CAAIG since its inception in 1983 and

Chief Executive Officer of EOC Nassau. Sadly, John Kearse passed away during the pendency of the action, and his estate is represented in this case by Stella B. Kearse.

## I. *The Prior Proceeding*

In a prior lawsuit initiated in 1993, L.I. Head Start brought an action against CAAIG and John L. Kearse, Judith Wilson and Alphonso Anderson, as Trustees of CAAIG. This action concerned the attempt to recover reserves paid to CAAIG by L.I. Head Start after it terminated its participation in CAAIG as of September 1, 1992. On March 3, 2000, this Court rendered a decision in that prior lawsuit in *Long Island Head Start Child Development Servs., Inc. v. John L. Kearse et al.,* 86 F.Supp.2d 143 (E.D.N.Y.2000). In that decision, the Court determined that CAAIG segregated the contributions of each of the participating employers, referred to as the "reserves." The Court directed CAAIG and the trustees of CAAIG to transfer the reserves of L.I. Head Start, which were on hand at the time of its termination, namely, the sum of $497,736, to a trust fund for the benefit of the members of L.I. Head Start, within 60 days from March 3, 2000.

On May 25, 2000 a judgment was entered by the Clerk of the Court against the defendants in the prior action in the sum of $802,831.57, which includes the principal sum of $497,736 plus pre-judgment interest in the sum of $131,271.79, attorneys fees in the sum of $151,375 and costs in the sum of $22,448.78. Apparently, no appeal was taken from this judgment. According to the complaint in the present action, this judgment remains unpaid, except for the sum of $45,375.19, leaving a balance due of $757,456.38 plus interest from December 14, 2000.

## II. *The Present Proceeding*

This is a class action, brought by L.I. Head Start and Paul Adams, derivatively on behalf of CAAIG and as class representatives of all other persons similarly situated. The action is brought against the other three former participating organizations in CAAIG, namely EOC Nassau, EOC Suffolk and Yonkers CAP. Also named as a defendant was John Kearse, the former Trustee and Administrator of CAAIG, and former Chief Executive Officer of EOC Nassau.

Initially, the nature of this action was to seek relief against the named defendants based on alleged various breaches of their fiduciary duty and prohibited transactions. The complaint alleged that (1) the defendants diverted the reserves of L.I. Head Start to pay benefits and administration expenses of the other participating agencies; (2) the defendants' failed to collect delinquent contributions from Yonkers CAP; and (3) the defendants failed to take other actions such as increasing premiums to adequately fund the plan.

In addition, during and after the trial, the plaintiff made motions to amend the complaint and/or to conform the pleadings to the proof with regard to six additional alleged "prohibited transactions" amounting to violations under ERISA § 406, 29 U.S.C. § 1106, as follows:

1. The pledge of CAAIG plan assets to CEDC, an affiliated credit union entity controlled by EOC Nassau, for use as collateral for a loan by CEDC to EOC Nassau.

2. The loan of $36,000 of CAAIG plan assets to EOC Nassau.

3. The failure to collect delinquent employer contributions from EOC Suffolk, which the plaintiffs allege constitutes a lending of money or extension of credit to a party-in-interest.

4. The CAAIG payments of travel expenses to George Grayback, a fiduciary and party-in-interest who is not an em-

ployee of CAAIG or the participating agencies.

5. The CAAIG payments of health and welfare claims for George Grayback and Nola Grayback who are not participants or beneficiaries under the CAAIG plan.

6. The CAAIG payments of excessive administrative fees in the form of bonuses to Profile Commercial Corp., a company engaged in employee benefit and group health programs.

Also, in the amended complaint there are two claims for unjust enrichment, the Third and Fourteenth claims for relief. In a prior decision in this action, dated June 3, 2008, 558 F.Supp.2d 378 (E.D.N.Y.2008), applying the six year statute of limitations period, the Court dismissed all the unjust enrichment claims based on events that occurred prior to December 1, 1994. As to the surviving unjust enrichment claims, the Court gave the parties an opportunity to address the issue as to whether "the diversion of the reserves to pay the benefits of the other participants was against equity and good conscience sufficient to sustain an unjust enrichment claim."

In the same June 3, 2008 decision, this Court decided the issues involving the plaintiffs' amendment motions and the defense of the statute of limitations. This decision resolved the issue of the surviving causes of action. The causes of action remaining in this case are as follows:

### The Pleaded Causes

1. The defendants' diversion of L.I. Head Start reserves to pay benefits and administrative expenses.

2. The defendants' failure to make the necessary contributions to adequately fund the CAAIG Plan and prevent diversion of the plaintiffs' reserves.

3. The unjust enrichment claims based on events that occurred subsequent to December 1, 1994.

### The Added Cause

4. The failure by CAAIG to collect the delinquent arrears in premium payments from EOC Suffolk.

### III. The Stipulated Facts

The attorney for the plaintiffs and the attorneys for the defendants EOC Nassau, EOC Suffolk and Yonkers CAP stipulated to the following facts:

1. Plaintiff, L.I. Head Start Child Development Services, Inc., formerly known as Long Island Day Care Services, Inc., is a not-for-profit corporation organized and existing under the laws of the State of New York.

2. Community Action Agencies Insurance Group ("CAAIG") or ("CAAIG Fund") was an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). [See L.I. Head Start, 86 F.Supp.2d at 144–45].

3. The CAAIG Fund was established for the sole and exclusive purpose of providing health and welfare benefits to employees of the participating/contributing employers within the meaning of ERISA, 29 U.S.C. §§ 1103(c)(1) and 1104(a)(1)(A).

4. The CAAIG Fund provided health, medical, dental and other benefits for the employees of defendant EOC Nassau, defendant EOC Suffolk, and any other employer who became a participating employer.

5. On November 30, 1985, plaintiff L.I. Head Start became a participating employer in the CAAIG Fund.

6. At the time that L.I. Head Start became a participating employer in the CAAIG Fund, defendants EOC Nassau, EOC Suffolk and Yonkers CAP also were participating employers in the CAAIG Fund.

7. As of August 31, 1992, the financial statements of CAAIG indicated that the

total amount of the reserves for all contributing employers was $1,117,507.

8. On September 1, 1992, L.I. Head Start elected to terminate its participation in CAAIG and requested the immediate return of the unspent monies in CAAIG's reserves attributable to past contributions made by L.I. Head Start on behalf of its participating employees.

9. On May 25, 2000, this Court entered a judgment in the prior action in favor of L.I. Head Start and the class plaintiffs against CAAIG and its Trustees for the sum of $802,831.57, including interest and attorney's fees.

10. Defendant Kearse served as a trustee of CAAIG since its inception in 1983 to June, 1998. Adrian Fassett ("Fassett") also served as a trustee of CAAIG from 1993 to June 11, 1998, when he resigned. Edward Hull ("Hull") also served as a trustee of CAAIG from 1994 to June 11, 1998, when he resigned.

11. The October 4, 1983 Trust Agreement governing the CAAIG Fund provided for the participating agencies to operate and administer the CAAIG plan.

12. The three defendant agencies, EOC Nassau, EOC Suffolk and Yonkers CAP, delegated the authority to administer and operate the CAAIG Fund to their respective chief executive officers, defendant Kearse, Fassett and Hull during the periods of their trusteeship.

13. Defendant Yonkers CAP withdrew as a participating employer of CAAIG as of June 30, 1998.

14. At the time that Yonkers CAP withdrew as a participating employer of CAAIG, it was indebted to CAAIG in the amount of $107,496 plus interest for unpaid contributions previously billed by and due and owing to CAAIG.

## IV. *The Ground Rules—The ERISA Standards*

As the Court previously stated in its June 3, 2008 opinion, ERISA is a comprehensive statute enacted to protect the interests of participants in employee benefit plans and their beneficiaries by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans. Section 404 of ERISA, 29 U.S.C. § 1104, sets forth a fiduciary's basic duties, as derived from traditional trust law principles. Pursuant to this section, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Whitfield v. Tomasso,* 682 F.Supp. 1287, 1301 (E.D.N.Y.1988). As later discussed, the participating agencies can be "fiduciaries." Thus, as fiduciaries, the defendant not-for-profit organizations, the trustees, and the deceased defendant-trustee all had a duty to act with care, skill, prudence and diligence in the management of the CAAIG Fund.

Further, as the Court also previously stated, the applicable statutes setting forth the purposes of the applicable ERISA statute and the obligations of the parties, are commendable and clear. 29 U.S.C. § 1103(c)(1) states, in pertinent part, that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." In addition, 29 U.S.C. § 1104(a)(1) states, in pertinent part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits

to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." "The fiduciary duty of loyalty imposed by ERISA is designed to ensure that fund assets are held and administered for the sole and exclusive benefit of plan participants." *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 61 (2d Cir.1994) (citing *Levy v. Local Union Number, 810*, 20 F.3d 516, 519 (2d Cir. 1994)).

(A) *Who is a Fiduciary under ERISA?*

As stated in *Bouboulis v. Transport Workers Union of America*, 442 F.3d 55 (2d Cir.2006), ERISA also provides that a " 'person is a fiduciary with respect to a plan, and therefore subject to ERISA fiduciary duties, to the extent that he or she exercises any discretionary authority or discretionary control respecting management of the plan, or has any discretionary authority or discretionary responsibility in the administration of the plan.' " *Bouboulis*, 442 F.3d at 63 (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 498, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)). In the ERISA "Definitions" statute, 29 U.S.C. § 1002(21)(A), it is provided:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. . . .

A review of the above statute reveals that subsection (i) imposes fiduciary status on those who actually do exercise discretionary authority, regardless of whether such authority is granted to them. On the other hand, subsection (iii) covers the individuals who have actually been given discretionary authority, whether used or not. So that a person has status as a "fiduciary" when he or she either exercises authority or has been granted the authority.

■ Even though the ERISA statutes refer to a fiduciary as a "person," the term includes an organization such as the corporate defendants in this case. The definition of a "person" who can be a fiduciary expressly includes partnerships, corporations, unincorporated organizations and employee organizations. In 29 U.S.C. § 1002, included in the "Definitions" is the following:

> (9) The term *"person"* means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization.

29 U.S.C. § 1002(9) (emphasis supplied).

In *Flanigan v. General Electric Co.*, 242 F.3d 78, 87 (2d Cir.2001), this principle was expressly stated by the Second Circuit:

> Under ERISA, a *person or corporation* is a plan fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of the assets . . . , or . . . he has any discretionary authority or responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). "Under this definition, a *person* . . . has [fiduciary] status only 'to the extent' that he has or exercises the described authority or responsibility." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d

1250, 1259 (2d Cir.1987) (emphasis supplied).

The Court finds that under the statutory and case law definitions, the three corporate defendants, EOC Nassau, EOC Suffolk, and Yonkers CAP, can be fiduciaries. It is undisputed that the October 4, 1983 Trust Agreement gave the participating agencies the ultimate authority to operate and administer the CAAIG plan. (*See* Plfs. Ex. 2 and 3, Stipulation of Uncontested Facts at ¶ 17, and Tr. 550). Thus, because of the discretionary authority granted to these defendants by the Trust Agreement, they were and remained fiduciaries with respect to the CAAIG plan, regardless of whether such discretion was actually exercised.

■ Further, even where a delegation of authority is made, a plan fiduciary may still be liable for known violations by a co-fiduciary and is charged with a certain duty to monitor the activities of its delegates. *Willett v. Blue Cross & Blue Shield,* 953 F.2d 1335, 1340–41 (11th Cir. 1992) (citing 29 U.S.C.A. § 1105(a)(3)); *see also* 29 U.S.C. § 1105(a)(2). Accordingly, as fiduciaries, the corporate defendants are subject to the strict ERISA rules governing their conduct.

■ Further, the evidence in this case clearly establishes that Kearse exercised a large degree of control and discretion with respect to the distribution of CAAIG funds. (Tr. at 621–23, 632, 655). Accordingly, Kearse was also a fiduciary with respect to the plan.

■ A fiduciary must discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries, *Abbruscato v. Empire Blue Cross and Blue Shield,* 274 F.3d 90, 102 (2d Cir.2001). "He must do this for the exclusive purpose of providing benefits to them. And he must comply 'with the care, skill, prudence, and diligence under the circum-

stances then prevailing of the traditional prudent man.'" *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.1982).

(B) *Liability for Breach of a Co–Fiduciary*

In addition to any liability which a fiduciary may have under the provisions of the ERISA statute, a fiduciary in a Plan may be liable for a breach of fiduciary duty by another fiduciary in the same plan, under the circumstances set forth in 29 U.S.C. § 1105(a).

§ 1105. Liability for breach of co-fiduciary

(a) Circumstances giving rise to liability

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

(b) Assets held by two or more trustees

(1) Except as otherwise provided in subsection (d) of this section and in section 1103(a)(1) and (2) of this title, if the assets of a plan are held by two or more trustees—

(A) each shall use reasonable care to prevent a co-trustee from committing a breach; and

(B) they shall jointly manage and control the assets of the plan, except that nothing in this subparagraph (B) shall preclude any agreement, authorized by the trust instrument, allocating specific responsibilities, obligations or duties among trustees, in which event a trustee to whom certain responsibilities, obligations, or duties have not been allocated shall not be liable by reason of this subparagraph (B) either individually or as a trustee for any loss resulting to the plan arising from the acts or omissions on the part of another trustee to whom such responsibilities, obligations, or duties have been allocated.

(2) Nothing in this subsection shall limit any liability that a fiduciary may have under subsection (a) of his section or any other provision of this part.

As seen by the breadth and scope of these statutes, ERISA fiduciary responsibilities are varied, enveloping and strict.

### (C) *Standing to Sue for Breach of Fiduciary Duty*

■ The plaintiffs bring the present action pursuant to ERISA sections 502(a)(2) and (3), as well as section 515.

Section 502(a)(2) provides that a civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109(409) of this title." 29 U.S.C. § 1132(a)(2). Section 409, in turn, provides that:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this sub-

chapter shall be personally liable *to make good to such plan* any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. 1109(a) (emphasis added).

Courts have interpreted this provision to mean that in the case of a fixed benefits plan, any recovery for a violation under section 409 inures to the benefit of the plan as whole, and thus, such actions must be brought in a representative capacity on behalf of the plan rather than for the benefit of any particular individual. *See Mass. Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 140, 142, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *see also LaRue v. De-Wolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 128 S.Ct. 1020, 1025, 169 L.Ed.2d 847 (2008) (distinguishing between defined benefits plans and contributory benefits plans); *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993).

In apparent recognition of this rule, the plaintiffs seek to enforce their judgment in the first action against any debt owed to CAAIG in this action pursuant to N.Y. CPLR 5227. Further, in their reply brief, the plaintiffs explain that they "do not want the Court to award them any money. Plaintiffs simply want the Court to order defendants to reimburse the plan reserves attributable to the plaintiffs for the amount improperly diverted from the plan." (Plaintiffs' Posttrial Reply Brief, at p. 5). The Court accepts the plaintiffs' contention that this action is brought in a representative capacity for the benefit of CAAIG as a whole and addresses the applicability of CPLR 5227 in greater detail below.

The Court is skeptical, however, of the applicability of section 502(a)(3), 29 U.S.C. § 1132(a)(3), to this case. This section provides, as follows:

(a) Persons empowered to bring a civil action

A civil action may be brought—

\*     \*     \*

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

29 U.S.C. § 1132(a)(3).

Section 502(a)(3) has been described as a "catchall" section "offering appropriate equitable relief for injuries caused by violations that [section] 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (internal quotations omitted). Although individual plan participants may bring suit for individual relief under section 502(a)(3), the relief sought must be equitable in nature. *Coan v. Kaufman*, 457 F.3d 250, 262 (2d Cir.2006). This requirement has been interpreted to exclude actions for monetary relief, except where restitution is sought from a specifically identified fund. *Id.* at 262–63. Here, the plaintiffs do not identify any specific fund or funds from which they seek recovery. However, as the Court has already determined that the plaintiffs' claims are appropriately asserted in a representative capacity pursuant to section 502(a)(2), it need not decide this matter. *See Varity*, 516 U.S. at 515, 116 S.Ct. 1065 (plaintiffs could appropriately rely on the third subsection of 502(a) because of the inapplicability of all other subsections).

Further, "[s]ection 502(g)(2) authorizes fiduciaries ... to obtain unpaid contributions pursuant to ERISA [section] 515, 29 U.S.C. § 1145, which requires employers participating in multi-employer ERISA plans to make obligatory contributions to the plans." *Coan v. Kaufman*, 457 F.3d at 258. Like actions pursuant to section 409, actions for violations of section 515 inure to the benefit of the plan as a whole and must be maintained in a representative capacity. In particular, section 502(g)(2) provides that where liability is determined pursuant to section 515, "the court shall award the *plan*" certain damage amounts. *See* 29 U.S.C. § 1132(g)(2). As the Court has determined that this action is brought in a representative capacity on behalf of the plan, the plaintiffs' cause of action for failure to make adequate contributions is appropriately maintained under section 502(g)(2).

Finally, with respect to these particular plaintiffs, the Court has previously determined that these parties, as former participants in CAAIG, have standing to pursue their claims on behalf of the plan. *See L.I. Head Start v. Kearse*, 86 F.Supp.2d at 153; *see also* 29 U.S.C. § 1002(7) (defining participant as "any employee of an employer or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan...."). In addition, as the corporate defendants, EOC Nassau, EOC Suffolk and Yonkers CAP are fiduciaries of CAAIG, so is L.I. Head Start for the purposes of section 502(g)(2).

## V. *The Trial*

Anthony Macaluso is a certified public accountant who was Director of Finance for L.I. Head Start from September 25, 1990. In this case, he was retained by the plaintiffs to do an analysis of the CAAIG financial statements and a report on the reserves used by CAAIG to pay the benefits of the employees of EOC Nassau, EOC Suffolk and Yonkers CAP after L.I. Head

Start left CAAIG. Macaluso testified that the reserves attributed to L.I. Head Start were used to pay benefits for other participating agencies and to pay the CAAIG administrative expenses. These payments were made from the sum of $497,736, which was the amount of its reserves when L.I. Head Start terminated its participation in CAAIG, "to the point it was reduced to zero, your honor." (Tr. at 143).*

In deposition testimony Adrian Fassett, a co-trustee of the CAAIG Fund, stated that Kearse had the responsibility to operate the CAAIG Plan. He testified that Kearse made the necessary decisions to operate CAAIG. Kearse was, at the same time, the administrator of CAAIG and EOC Nassau. In his own words, Kearse "ran the programs at EOC of Nassau," and that EOC of Nassau rather than EOC of Suffolk "ran" the CAAIG operation. Further, in his own deposition, Kearse admitted that he was a fiduciary of CAAIG, which did not have a Board of Trustees. Kearse acknowledged that he made the major decisions as well as the "final decisions" in the operation of CAAIG. In addition, Kearse testified that Yonkers CAP was also subject to his decisions.

Significantly, Kearse testified that it was EOC Nassau that was authorized to direct the CAAIG trustees to make payments and distributions. Within EOC Nassau, it was Kearse who would make the final decisions with respect to authorizing payments and distributions. In sum, Kearse had "the final word" as to EOC Nassau and, more importantly, for CAAIG as well.

With respect to the outstanding account receivable from Yonkers CAP to CAAIG in the sum of $36,000, no interest was charged on this debt. In addition, for more than one year, there were accounts receivable then in excess of $100,000 due to CAAIG by Yonkers CAP. Further, CAAIG wrote off the outstanding Yonkers CAP debt "so that their fiscal condition could be looked at in a more favorable position." (Tr. at 616–17). In addition, notwithstanding this substantial debt which was outstanding for more than one year, CAAIG continued to pay the claims of Yonkers CAP employees. According to Kearse, these payments were made "in accordance with the policies or rules or regulations of CAAIG." (Tr. at 621). However, the Yonkers CAP cause of action is no longer before the Court.

It is clear that in his decisions, Kearse made no differentiation between CAAIG and EOC Nassau.

Q. Mr. Kearse, was your sole fiduciary obligation with respect to CAAIG directed to CAAIG, or did you feel you had an obligation, a fiduciary obligation, to the other contributing agencies who may be in financial trouble?

A. I made no differentiation between the two based upon the fact that CAAIG in my view, and I've represented it a zillion times, is a program of the Economic Opportunity Commission of Nassau County. As such it was my board that directed that it be established and managed and administered. It was my board that allowed me, as the administrator, to invite in our companion agencies who were having similar problems so that our group could become larger so we could even negotiate better terms with insurance carriers and/or brokers or whomever we may have been using, because we were all of similar purpose and organization.

          *          *          *

Q. I'm just trying to see where your loyalty is with respect to be your fiduciary obligation to CAAIG.

* Tr. refers to the trial transcript

A. My fiduciary responsibility, sir, stems from my fiduciary responsibility to my employer and my agency. And I said to you, CAAIG as far as I was concerned was a program of my agency.

Q. So when you say your employer, you are identifying EOC of Nassau?

A. Yes.

(Tr. at 621–23).

The CAAIG financial statement for the year ending August 31, 1992 indicated that the Yonkers CAP accounts receivable of $102,000 plus "was written off the books", and extinguished as uncollectible, and was no longer a debt to the fund. (Tr. at 627, 629). Yonkers CAP was removed as a participating employer even though the policy of CAAIG was "not to cancel any contributory agency for failure to pay their outstanding obligations." (Tr. at 632). The reason given by Kearse for the departure from CAAIG policy was "That is the way I ran the plan." (Tr. at 632). Nevertheless, Yonkers CAP was reinstated in the Plan as of August 1992, even though it did not pay its outstanding obligation. It was allowed to return after a report was received that it was more financially stable. Kearse explained that CAAIG did not pressure Yonkers CAP to pay the arrears because of the public funding of the agency and the promise that the "program was back on course". (Tr. at 2142). Also, Kearse testified that Yonkers CAP funds could not be seized by CAAIG. Eventually both Yonkers CAP and EOC Suffolk withdrew from the Plan on June 30, 1998, and neither agency demanded return of its premium payments.

Sobana Prasad is a certified public accountant and the Director of Finance of EOC Nassau from July of 1995. She testified that when the CAAIG Fund stopped functioning in 1998, there were outstanding accounts receivable for all three participating agencies. Prasad and her staff performed the accounting work . for

CAAIG, under her supervision. She also assisted in preparing the CAAIG financial reports for several years beginning in the fiscal year ended August 31, 1995 to the fiscal year ended August 31, 1997. The final financial statement, of the year ending August 31, 1997 contained a note five called "termination of the program." This note reads "the employer will distribute and apply to remaining surplus." The "remaining surplus was the approximately $50,000 in the Fleet Bank account." The money was not distributed because of a pending lawsuit, namely the prior lawsuit between some of these parties.

Prasad also testified, by deposition, that the CAAIG Plan was terminated in May 1999. After May 1998, one Iris Johnson was named Executive Director of EOC Nassau and became Prasad's superior. Johnson approved the checks after that date. Johnson also signed the CAAIG checks and was involved in making decisions for CAAIG. At that time all three participating agencies had withdrawn from CAAIG.

Adrian Fassett was the CEO of Yonkers CAP and a trustee of CAAIG for the period from May, 1993 to June, 1998. Fassett testified in his deposition that the trustees voted to allow Kearse to be the Administrator of CAAIG and "in effect run the CAAIG Plan" and they "gave him responsibility for the day-to-day administration and operating of the CAAIG." Further, the trustees of CAAIG delegated to Kearse the authority to monitor the financial status of CAAIG on a constant basis. In addition, the decisions to increase the premiums were made by Kearse. Stated simply, the trustees delegated complete authority to Kearse to administer and operate the CAAIG plan. (Tr. at 655).

Fassett testified that the trustees operated the CAAIG funds "as a pool." Therefore, if there was no money in the Yonkers

CAP reserves to pay their employees' claims, other reserves by the other participants would be used to pay the claims. However, of importance, Fassett also testified that in his actions, he relied on the amendments to the Trust Agreement, which were invalidated by this Court in the prior action. (Tr. at 672).

Portions of the testimony of Kearse from the prior trial and his depositions were also read into the record. Kearse testified that the trustees never inquired as to the financial status of CAAIG except at Board meetings and he never submitted financial reports to the agencies other than annual fiscal reports. He testified that there was no invasion of the reserves, because these were assets of the Plan for all the participants. Further, Kearse did not seek legal advice as to whether the L.I. Head Start money remaining in the Plan after it left CAAIG could be used to pay the claims of the other participants. This was so, even after the prior class action was instituted.

Kearse testified as to the purpose of CAAIG as follows:

Q. Sir, let me go back for a second.

The CAAIG as an entity provided— what was the purpose of the CAAIG?

A. The purpose of the CAAIG was to make it possible for this group of people to provide benefits to their employees, most of whom were or had been recruited from the poverty community. We are all community action agencies, and under the law we are called anti-poverty agencies. I will not refer to the law again, your Honor.

But we have tried rather unsuccessfully to have ourselves incorporated into the—in the insurance or the benefits programs that were available to people who were not-for-profit, providing social services to the community, or governmental agencies providing services to the community under an umbrella which existed from the state into which the localities 'and municipalities' employees were accepted.

Q. In light of that attempt, Mr. Kearse, what was the purpose of the CAAIG?

A. It was a response to the fact that we were not being offered the same kind of coverage.

Q. Sir, when you say it was a response to the fact that you were not offered the same kind of coverage, what did the CAAIG end up doing?

A. Okay.

The CAAIG ended up providing our employees with life insurance, disability insurance, long-term and short-term insurance, even unemployment insurance. We provided dental coverage. We provided hospitalization coverage. We provided pharmaceutical coverage for our employees.

Q. Prescription drugs?

A. Prescription drugs.

(Tr. at 1598–1599).

As to the reserves, Kearse testified that there is no way that CAAIG could return the reserves to a departing agency "and meet our fiduciary responsibilities." (Tr. at 1626). This subject was discussed at several meetings of the trustees. Kearse referred to the so-called reserves as plan assets. He defined plan assets as funds that provide services to their employees to meet their needs and that that do not belong to any individual member and instead belong to the "group." In his view, there are no "reserves" refundable to L.I. Head Start. The "reserves" belong to CAAIG to protect the viability of the Plan coverage.

Kearse testified that with regard to its delinquency in payments, it would not be prudent to sue Yonkers CAP. Kearse testified that the result of such a move would be to destroy the entire Plan and would

hurt the individual employees who would be without these benefits. In addition, in his view a lawsuit would bring no funds.

Kearse testified that bonuses were paid to Profile Commercial Corp. ("Profile") because CAAIG was able to accomplish savings attributed to Profile's work. It was unanimously agreed by the CAAIG trustees to pay these bonuses to Profile. With regard to the payment of claims of George and Nola Grayback, he signed the checks in payment of these claims. At first, Kearse was unaware that the Graybacks were receiving claimed benefits from the Fund. He later became aware of these payments. When Kearse looked at the checks, he saw the names of Grayback and his wife on the checks, "and that's when I became aware of it." (Tr. at 1734). However, he testified that he did not know that the Graybacks were not eligible for payments under the Plan. Ultimately, even though consultants such as Grayback were not usually eligible to receive benefits under the Plan, a decision was made to pay the claims. According to Kearse the amounts were small, and this was the best way to maintain a good relationship with Grayback. However, he advised Grayback to submit no further claims in the future. No other claims by Grayback were submitted. The proof revealed that there were 25 claims submitted by the Graybacks between 1985 and 1989, and the total amount of the Grayback claims as of January 25, 1996 was the sum of $8,966.43. Ultimately, the evidence revealed that the Graybacks received a total of approximately $15,000 in benefits from the Plan. (*See* Tr. at 1763). The Court finds that these payments for the Grayback claims were improper and unauthorized by the Plan. Only employees of the participating agencies were covered by the Plan. However, this claim involving the Graybacks is also not before the Court.

As a result of a Consent Judgment dated October 5, 1996, in the Eastern District of New York, in an action entitled *Herman v. Kearse,* dated October 5, 1996, Kearse resigned as a Trustee and fiduciary of the CAAIG Plan. By this Consent Judgment, he was prohibited from being a Trustee in any Taft–Hartley Plan.

Kearse also explained that the contributions to CAAIG were made by the employers of the participating agencies. Contributions were not made by the employees. The monies used to make these premium payments were from funding sources such as federal, state or local grants.

The amount of the reserves as of August, 1998 was the sum of $474,924.54. Significantly, Kearse testified that these reserve monies were disposed of by "paying claims for participants" and to pay "runoff claims." (Tr. at 2166). In addition, he stated that he was "not sure how the funds were distributed."

Q. And how were the funds that reflected in the document in front of you, how were they physically distributed after Suffolk EOC and Yonkers CAP withdrew?

A. How were they distributed after August 31, '98?

Q. Yes.

A. I'm not sure.

(Tr. at 2167–2168).

After EOC Suffolk and Yonkers CAP withdrew from the Plan Kearse was not sure whether EOC Nassau continued in the Plan or withdrew. However, at that point CAAIG became defunct.

In the defendants' case, William Rowley testified that he is employed by Profile, a company specializing in employee benefit and group health programs. Profile was first affiliated with CAAIG in 1984. Profile was employed by CAAIG to review their insurance program and obtain quotes

from competing insurance companies. At that time the CAAIG program was insured by Connecticut General Insurance Company and then the Massachusetts Mutual Insurance Company. He and George Grayback dealt with CAAIG on behalf of Profile. Eventually, they recommended a self-insured plan for CAAIG, which was adopted. In December 1986, CAAIG became a self-insured plan based on the same benefits and contributions as under the insured plan. This program included life insurance and short and long term disability insurance. Profile was the Administrator of the Plan and Grayback handled the claims review and payment of the claims. The trustees had annual meetings and the day-to-day operations were managed by Profile.

At the time the Plan became self-insured there was a reserve consisting of excess premiums. This reserve was used as a back-up. The participating agencies paid the premiums, not their employees. Profile sent bills for premiums to the agencies on a monthly basis. The premium checks were deposited into a CAAIG fund account. There were no separate accounts for the individual agencies and, according to Rowley, the premiums were pooled and not segregated. He stated that the reserves were an integral part of a self-funded program and were not to be returned to agencies that might withdraw from the Plan.

After L.I. Head Start requested a return of their contributions, he "would have advised against returning the reserves." He felt that the reserves were important for the solvency of the plan." (Tr. at 1034). At that time the reserves were at one million dollars, and were maintained at that level, for at least seven years.

There came a time when Yonkers CAP had difficulty with their funding sources and could not pay part or all of their premiums. Despite its inability to pay the premiums, Yonkers CAP was allowed to stay in the Plan. According to Rowley, at that time, in March 1992, L.I. Head Start agreed to allow Yonkers CAP to continue in the Plan even though it was delinquent in its payments.

On cross-examination, Rowley testified that there should be one year of premium reserves necessary to insure payment of the future claims. After L.I. Head Start left CAAIG in September, 1992, the reserves were significantly reduced. In 1992, CAAIG converted its name and organization to Community Action Agencies Insurance Group Trust. This reorganization had the same trustees and the same three participating agencies, EOC Nassau, EOC Suffolk and Yonkers CAP. Profile processed the claim of the new CAAIG Trust. For the year ending August 31, 1991, Profile received fees of $55,500 for 470 participants in the CAAIG Plan. For the year ending August 31, 1993, Profile received fees of $161,500 for 181 participants. So that even though there was a fifty percent reduction in the number of participants, Profile's fee increased substantially.

Rowley stated that he was not aware that CAAIG was paying medical benefits for the Graybacks. Further, Grayback prepared the claim and the checks for CAAIG in payment of his own benefits.

Rowley testified that, in addition to the monthly payments of $11,791.67, Profile was paid bonuses of $20,000 per year for seven years. Further, there was no record of these bonus payments or payments to Profile in the CAAIG board minutes. For the year ending August 31, 1989, Profile was paid the sum of $134,000 in addition to the bonus of $20,000. As stated above, the compensation to Profile did not change even though the number of employee participants was reduced from 470 to 181.

Rowley testified, as set forth in the Summary Plan, if a contributing employer did not pay their contributions within 30 days, it would be terminated from the fund. However, Yonkers CAP was in default for more than two years and was not terminated. Rowley advised the trustees at a meeting that "they should try to collect the monies that were due from Yonkers CAP to CAAIG, otherwise they would be in breach of their fiduciary duties." (Tr. at 1289). The trustees responded that they tried to collect the money but no lawsuit against Yonkers CAP was instituted. Rowley noted that participants in the agencies were working in an anti-poverty program on low wages. He stated, in that regard, CAAIG was a unique program.

It was Rowley's position that the trustees needed to have a rule that, if premiums are not paid within thirty days, coverage shall cease. In this regard, he recommended to the trustees that they "go after Yonkers CAP to collect the delinquency due by that agency." Rowley stated that he believed they did follow his advice in that regard. Yonkers CAP was in default in payment of their premiums from 1990 to 1998 when CAAIG was terminated and yet, during that time, new employees were covered and their claims were paid under the CAAIG Plan. The proof showed that Yonkers CAP was in default in the sum of $102,304 in 1993 and that debt remained to March 2001. Rowley was not aware that Grayback was charging the Fund $1,000 per month for travel expenses from his home in New Jersey. For the year ending August 31, 1990, Grayback received $9,000 in travel expenses.

With regard to the reserves, Rowley testified that, during regular times, reserves would not be used to pay premiums or claims. However, in "bad years" the reserves could be and were used to pay the claims.

Q. But if the fund is losing money every year, and the losses—the expenses exceed the income, then the reserve could be used to pay claims?

A. Yes.

Q. Therefore, from 1992 to 1998 when Yonkers CAP left the plan, the reserves were in fact used to pay the claims of Yonkers CAP?

MR. BREWINGTON: Objection.

THE COURT: Overruled.

A. To pay claims—I can't characterize it to be from one agency or the other, but used to pay claims.

Q. And those claims would include the claims of Yonkers CAP, would they not?

A. Yes.

(Tr. at 1562).

The peak year for CAAIG was in 1984, when it had 639 participants. In 1987, CAAIG had 449 participants. After the withdrawal of L.I. Head Start, the number of participants was reduced by more than 50%.

With regard to the delinquent arrears in premium payments by EOC Suffolk, there was a meeting held on March 22, 1991. In the memorandum relating the events of the meeting (Dfts. Ex. AC), Chairman Randall of EOC Suffolk stated "frankly that they were out of money and could not make the January payment, and do not think they can make the next payment." Aside from the past due premiums, which Grayback stated were $38,000, Randall said that EOC Suffolk could keep current. Also, Kearse stated the following:

Mr. Kearse clarified for them that they were proposing that the indebtedness be paid down on an "as possible" basis, rather than scheduled. He said that he was willing to listen. He assured them that although he had been ready to part company as of this meeting, we are not in an adversary role, but must safeguard

the plan. Mr. Kearse explained that our overall responsibility is to the staff who did not create the problem. However, he stated that he is ready to work with Suffolk EOC to maintain their presence in the plan."

After the trustees approved the rate of the premiums on a yearly basis, Profile made out the monthly premium checks. Sometimes, Rowley verbally advised the trustees of the premium rates and they approved them. There was a policy by the trustees that if one of the agencies was in financial difficulty and didn't get their grant money in time and could not pay the contributions to CAAIG, "the trustees decided not to go after or collect the monies from a delinquent agency until they were able to get back on their financial footage." (Tr. at 1562). This policy was followed by the trustees even though the Health Coverage Plan states that a failure to submit the appropriate premium charge within the period of thirty days shall cause coverage to cease. The Health Coverage Plan stated:

### Premiums

All premiums are due and payable on the first day of each month by the Program Director of any of the specific entities of CAAIG. A failure to submit the appropriate premium charge within the grace period of 30 days shall cause coverage for all claims to cease from that month forward. For example, a premium due on January 1st and not paid by January 30th shall cause coverage to terminate retroactively to January 1st. (Plfs. Ex. 13 at p. 16).

It was Rowley's position that the trustees needed to have such a rule, and that they should comply with the rule; namely if premiums are not paid within thirty days, coverage shall cease. In this regard, he recommended to the trustees that they "go after Yonkers CAP to collect the delinquency due by that agency."

## VI. *The Defendants' Contentions*

### (A) *Contentions by EOC Suffolk*

EOC Suffolk contends that its trustee, Adrian Fassett took reasonable means to monitor the actions of Kearse, who had been designated to operate the day-to-day operations of CAAIG. In a major contention, it asserts that when using the L.I. Head Start Reserve Fund, instead of increasing the rate of contributions to the Plan, Fassett relied on the trust agreements then in existence. EOC Suffolk contends that "This is what was required by the express terms of the trust documents" (Post-trial Brief of EOC Suffolk at p. 9) and by the amendments. Moreover, according to EOC Suffolk, if Fassett voted in 1993 to return the L.I. Head Start Reserves, "he would have blatantly committed a fiduciary breach by violating the express term of the trust amendment which provided for forfeiture of the reserves of a withdrawing employer" (*Id.* at 9). EOC Suffolk further contends that this Court's determination in the year 2000 that the amendments to the Trust Agreement were invalid, was of no assistance to Fassett in making the decision in 1993 to retain L.I. Head Start's reserves. The express language of the Trust Agreement amendments permitted the Fund to retain the L.I. Head Start excess contributions.

The post-trial Brief of EOC Suffolk states that Fassett properly performed his duties as Trustee and EOC Suffolk should not be held liable in this case. EOC Suffolk concludes that it should be absolved of liability and the sole liability here is by EOC of Nassau and the Estate of John L. Kearse, in the following language:

It is respectfully submitted that had Kearse disclosed to Fassett that the October 6, 1983 amendment was fabricated, Fassett would have voted to return Head Start's reserves. This concealment by Kearse rendered it impossible

for Fassett to come to any other conclusion than the one he did. As a result, EOC of Suffolk should be absolved of liability and sole liability should be imposed on EOC of Nassau and Kearse's estate ... Liability must fall on EOC Nassau and Kearse's estate for his failure to disclose that the October 6, 1983 document was a fabrication.

(Post–Trial Brief of defendant EOC of Suffolk at pp. 10, 11).

In addition, EOC Suffolk contends that when it withdrew from CAAIG on June 30, 1998, there was a balance of at least $223,549 in the CAAIG accounts. Fassett resigned as a trustee of CAAIG on the same date. EOC Suffolk therefore asserts that, "[f]urther liability, if any, for the disposition of these funds must fall to EOC of Nassau and Kearse, who continued to operate CAAIG." (*Id.* at 10).

(B) *Contentions by EOC Nassau; Yonkers CAP; and Kearse*

In a single Joint Post–Trial Brief, these three defendants raise five major contentions. First, they contend that the plaintiffs no longer have standing to bring these ERISA claims. The defendants state that:

Plaintiff Head Start withdrew from the CAAIG in September, 1992, and the class represented by Adams has not been a participant or beneficiary of the CAAIG since then. In fact, plaintiffs describe Adams and the class he represents as "former plan participant(s)" (Complaint ¶ 1). No standing is conferred upon Head Start, who had not been a fiduciary, if it ever was a fiduciary, since September 1, 1992, eight years prior to the commencement of this action. Neither former fiduciaries nor former plan participants have standing to bring these breach of fiduciary claims.

In regard to "standing," counsel reviewed the various ERISA statutes and concluded that because the plaintiffs are former participants and do not seek remedies for the benefit of the Plan, "none of the plaintiffs have standing under § 502(a)(1)(B), § 502(a)(2) or § 502(a)." However, as previously discussed, the plaintiffs have standing in this action.

In their second contention, these defendants contend that they "cannot be liable as fiduciaries for the ERISA claims asserted against them." (Joint Post–Trial Brief at p. 15). In this regard, these defendants state that the CAAIG trustees "were vested with almost complete discretionary authority and exercised that authority, while the functions of the participating agencies were ministerial." (*Id.* at p. 17). The defendants assert that the duty to administer and manage CAAIG was delegated to the individual trustees "who exclusively exercised that authority in making the decisions challenged by the plaintiffs." (*Id.* at p. 18). However, as previously discussed, fiduciaries can absolve themselves of all liability simply by delegation of certain duties.

In their third contention, these defendants assert that the plaintiffs failed to establish any breach of fiduciary duties. The defendants dispute that the "strict prudent person" standard under ERISA § 404(a) applies in this case. Rather, they contend that the claims in this case should be evaluated under an arbitrary and capricious standard. However, regardless of the applicable standard, the defendants contend that the plaintiffs failed to establish *any* actionable breach of fiduciary duties, as follows:

1. The reserves were properly used to pay benefits of other participants and beneficiaries.

2. The challenged decisions of CAAIG do not violate the Prohibited Transactions Rule of § 406, 29 U.S.C. § 1106 in that most of the actions complained of fail to satisfy the transaction element of ERISA

§ 406. Also, they assert that the forgiveness of the modest debt of EOC Suffolk was reasonable and appropriate. Further, the expense in pursuing a $9000 debt was unjustified.

3. Similar to the major contention by EOC Suffolk, these defendants contend that the decisions challenged by the plaintiffs "were reasonably made and in good faith compliance with plan documents...." Also, the decisions made by the defendants were prudent "in light of what could reasonably have been known to the trustees at the time...." (*Id.* at p. 23).

4. As to their fourth contention, the defendants assert that the plaintiffs failed to establish damages with the requisite certainty.

5. The defendants' fifth and final contention is that the plaintiffs' unjust enrichment claims must fail because "[n]one of the participating agencies were enriched, unjustly or not, by the use of the reserves to pay benefits to participants and the administrative expenses of CAAIG." Also, their conduct was not against equity or good conscience.

Finally, these defendants dispute the plaintiffs' claim as "judgment creditors of CAAIG" because such a claim is preempted by ERISA, and, in any event, the defendants are not debtors of CAAIG.

## VII. *Discussion*

The Court will now determine the plaintiffs' claims.

(A) *The Claim that the Defendants Diverted the Reserves of L.I. Head Start to Pay Benefits and Administrative Expenses*

■ The defendants concede that they used the reserves left by L.I. Head Start, for the benefit of the remaining agencies' employees and for administrative expenses after it terminated its participation in CAAIG on September 1, 1992. In the

Post–Trial Brief of the defendant EOC Suffolk it is stated: "Also, upon the advice of the attorneys and in accordance with the terms of the Trust Agreements, the trustees applied those funds for the benefit of the remaining participants' employees and administrative expenses." (Post–Trial Brief of EOC Suffolk at p. 3).

In this regard, the Court notes that the attorney for EOC Suffolk referred to amendments to the organized Trust Agreement, dated October 6, 1983 and August 7, 1986. In the Court's prior decision of March 3, 2000, these amendments, which stated that voluntary termination by any member "shall result in forfeiture of all accumulated funds to the Trust Fund," were both declared invalid and not binding.

In response, the defendants contend that until this Court invalidated these amendments, they assumed that they were valid and binding. These amendments permitted the diversion of the L.I. Head Start reserves. In addition, the defendants assert that their attorneys advised them to use the reserves.

Here, at this juncture, is the major issue in this lawsuit, namely the diversion of the L.I. Head Start reserves by the participating agencies. The defendants assert that they relied on the two amendments to the initial Trust Agreement, which permitted them to use the L.I. Head Start reserves. The Court will now address this contention and review the previous findings with regard to the Trust Agreement and the two amendments.

Pursuant to the terms of the October 4, 1983 Trust Agreement, the participating employers were required to and did make payments to CAAIG on behalf of their covered employees. While the October 4, 1983 Trust Agreement was silent as to the transfer of reserve funds, the defendants contend that the terms of that agreement

were superseded, modified and amended by a second trust agreement that was apparently executed by Kearse and Lorenzo Merritt, the then Director of Suffolk EOC on October 6, 1983. This amendment prohibited the transfer of reserves to any employer who withdraws from CAAIG. The defendants also rely on another amendment to the original Trust Agreement dated August 7, 1986. This amendment also prohibited the transfer of reserves to any agency that withdraws from CAAIG.

As stated above, while the October 4, 1983 Trust Agreement was silent as to the transfer of reserve funds, the October 6, 1983 amendment stated that "[v]oluntary withdrawal or termination of any of the member CAA, shall result in forfeiture of any and all monetary participation in the accumulated funds in the Trust Fund." In its March 3, 2000 decision, the Court determined that "the October 6, 1983 'agreement' has no effect on the rights of the parties as there is no credible evidence that the document was executed at any time relevant to the disposition of this action." *L.I. Head Start v. Kearse,* 86 F.Supp.2d at 147.

The purported August 7, 1986 amendment to the Trust Agreement stated that "[T]he Trustees amend the above named Trust Agreement by adding [the following language]. In no event may any unit ... withdraw any accumulated portion of the reserve fund, whether or not that unit's participation in the Trust is to be continued. Such reserve funds are to remain in the Trust, to be used or distributed in accordance with the provisions and purposes of this Trust." As to this amendment, the Court previously found in its 2000 decision, "that the August 7, 1986 Amendment was not properly adopted and is not valid." *Id.* at 150.

However, in the period from September 1, 1992, when L.I. Head Start terminated its relationship with CAAIG until March 3, 2000, when the Court invalidated these two amendments, they could have been relied upon by the defendants. These two amendments permitted the defendant agencies to use the L.I. Head Start reserves "in accordance with the provisions and purposes of this Trust." Stated simply, based on the two amendments to the Trust Agreement, the three defendant agencies were authorized to use the reserves to pay employee benefits and the administrative expenses of CAAIG; precisely the actions which are now the basis for the plaintiffs' first claim for breach of fiduciary duty.

The plaintiffs' response to this compelling argument, as set forth in their Post–Trial Reply Brief, is that the then pending lawsuit ... included a challenge to the validity and legal effect of the plan documents in question." (Post–Trial Brief at p. 20). Also, the plaintiffs assert that "reliance on plan documents without more does not shield defendants from liability under ERISA ..." (Post–Trial Brief at p. 21). Further, the plaintiffs state that "[i]n light of the legal challenge to the plan documents and reserves, a prudent person under like circumstances ... [would seek] the advice of the Fund's counsel...." (Post–Trial Brief at p. 21). The Court disagrees.

One problem with this contention by the plaintiffs is that they failed to raise the invalidity of the two amendments in their pleadings filed in 1993. A review of the Amended Complaint, dated October 6, 1993 and filed on October 14, 1993, reveals that not a word was mentioned about the invalidity of either amendment. Therefore, to 1993 at least, no notice was given to the participating agencies that they could not rely on the two amendments, which expressly gave them the right to use the L.I. Head Start reserves for their own

purposes. It was not until the March 3, 2000 decision that the two amendments were invalidated.

In this regard, the Court agrees with the forceful statement by counsel for EOC Suffolk. It is right on the mark:

Plaintiffs alleged defendants violated ERISA § 403 and § 404 by failing to increase the rate of contributions to the plan instead of using Long Island Head Start's reserves to pay benefits for the remaining employees fees. This argument focuses not on the time of the decision, but rather from the vantage point of hindsight. Fassett, in reliance on trust documents that were ostensibly in existence in 1983 and certainly in effect by 1988 and 1989 as demonstrated by EOC of Suffolk's audits, voted to refuse to return Long Island Head Start's reserves and agreed to apply the same to the remaining agencies employees. This is what was required by the express terms of the trust documents. His actions were also based on advice of CAAIG's attorneys. Nowhere in plaintiffs' complaint or other pleadings was there ever a hint that the trust documents were forged, altered or invalid. A trustee is not a guarantor or required to be omniscient. Had Fassett voted in 1993 to return Long Island Head Start's reserves, he would have blatantly committed a fiduciary breach by violating the express terms of the trust amendment which provided for forfeiture of the reserves of a withdrawing employer. This Court's determination in 2000 that the trust documents relating to forfeiture were invalid was of no assistance to Fassett in making the decision in 1993 to retain Long Island Head Start's reserves. (Post–Trial Brief of defendant EOC Suffolk at p. 9).

In addition, as stated above, the attorneys for CAAIG and the participating agencies advised the defendants that they were correct in using the L.I. Head Start Reserves and would prevail in the lawsuit. As late as May 9, 1996, attorney Allen Breslow reviewed the status of the first lawsuit, and advised the trustees that the demand of L.I. Head Start for the return of their premiums was "similar to requesting that auto insurance premiums be returned if there had been no accidents." (Dfts. Ex. AR).

Notwithstanding the strong language in the ERISA statutes, there has been no breach by the defendants in the use of the L.I. Head Start reserves. In particular, the defendants did not violate the "Prudent Man Standard of Care" and the required "care, skill, prudence and diligence" that a "prudent man acting in like capacity" would use in a similar situation. With reasonable certainty, even a prudent trustee of a community organization such as the participating agencies in this case, would have relied on the two amendments to the Trust Agreement, which expressly permitted them to use the monies alleged to be reserves and the property of L.I. Head Start. Nor did the complaint state in any way that the amendments were not valid and binding. Nor does the fact that on March 3, 2000, this Court determined that CAAIG should have transferred its reserves to L.I. Head Start when it terminated its participation in CAAIG, alter the decision that *at the time*, the participants had a right to rely on the amendments to the Trust Agreement, and use the reserves to pay employee benefits and administration expenses.

Accordingly, the Court finds that the plaintiffs failed to prove that the defendants breached their duty when they diverted the L.I. Head Start reserve to their own purposes and uses, namely, to pay employee benefits and administration expenses. This claim is dismissed.

(B) *As to the Claim that the Defendants Failed to make the Necessary Contributions to Adequately Fund the Plan and Prevent Diversion of the Plaintiffs' Reserves*

The plaintiffs contend that the defendant agencies violated their fiduciary obligation under ERISA by failing to make the necessary contributions to adequately fund the Plan. The governing Trust Agreement obligated each participating employer to make the necessary contributions so as to provide the required benefits to payees and the distributees under the Plan.

With regard to the issue of diversion of the plaintiffs' reserves by the defendants, it is conceded by EOC Suffolk, that "upon the advice of the attorneys and in accordance with the terms of the Trust Agreements, the trustees applied these funds for the benefit of the remaining participants' employees and administrative expenses." (*See* Post–Trial Brief of Defendant EOC of Suffolk at p. 3). In this case, the Court has determined that this diversion was not a violation of the defendants' duties under the ERISA statute. However, the Court also finds that the defendant agencies violated their fiduciary duty under the provisions of ERISA, by failure to make the necessary contributions to adequately fund the Plan. The Trust Agreement obligated each participating employer to make the necessary contributions so as to provide the required benefits to payees and distributees under the Plan.

The governing Trust Agreement that established CAAIG, at Section 3.1, states the following:

*Management and Control of Trust Fund Assets*

3.1 *The Trust Fund.* The term "Trust Fund" comprises all property of every kind held or acquired by the Trustee under this Agreement. The Corporations shall make the necessary contributions to provide the benefits expected to become payable under this Trust to payees or distributees under any plan. (Plfs. Ex. 12).

Under the terms of the Trust Agreement, each participating agency is obligated to make the "necessary contributions" to provide the benefits payable to the employees involved. However, beginning in the year 1995, there were insufficient funds in the Plan to pay the medical claims of the employees and the administrative expenses of CAAIG. The evidence at the trial revealed that starting in 1995 and continuing to March 2001, the defendants used the L.I. Head Start reserve funds to pay these claims and administrative expenses, because of the lack of sufficient contributions. Notwithstanding their right to use these reserves, the defendants were obligated to increase their own contributions to the Plan. They failed to do so. The record indicates that the reserves were reduced from $1,088,340 in 1995; to $474,924 in 1996; to $373,054 in 1997; and then further reduced until depleted in March 2001. (*See* Plfs. Ex. 5).

There is a specific statute, namely, ERISA § 515, 29 U.S.C. § 1145, which governs Delinquent Contributions. This statute states that, "Every employer who is obligated to make contributions . . . under the terms of the plan . . . shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." Here, the participating agencies violated section 515 by failing to make the contributions agreed upon in their Trust Agreement. As stated in *Winterrowd v. David Freedman and Co., Inc.,* 724 F.2d 823 (9th Cir.1984), the employer's failure to contribute the agreed upon funds is an ERISA violation. *See also Central Pennsylvania Teamsters Pension Fund v. W & L Sales, Inc.,* 778 F.Supp. 820 (E.D.Pa.1991); *Rubenstein v. Tri–State*

*Transport, Inc.*, 646 F.Supp. 1 (D.Mass. 1984).

■ In *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 916 (2d Cir.1989), the rule was noted that "trustees have a fiduciary duty to act to ensure that a plan receives all funds to which it is entitled so that those funds can be used on behalf of participants and beneficiaries." *Diduck*, 874 F.2d at 916 (internal quotations and citations omitted). In this case, the participating agencies and their trustees failed to adequately fund the Plan. *See also Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 571, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) ("ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled . . .").

As to Kearse, although not an "employer" as that term is used in section 515, he testified in the prior action that he had a fiduciary responsibility not only to EOC Nassau but to CAAIG. Kearse testified that he made the major decisions with regard to the operations of CAAIG and that his authority and responsibility to make such decisions derived from the Board of Directors of EOC Nassau. (Prior Tr. at 579–580). Kearse was also responsible with regard to the failure to make the necessary contributions to adequately fund the Plan, instead of expending the L.I. Head Start reserves. Accordingly, the Court finds that Kearse has separately violated his section 404 fiduciary obligations. (*See* 29 U.S.C. § 1104).

In sum, all the participating organizations and their trustees had a fiduciary duty to act to ensure that the Plan received all the funds to which it is entitled from the participants so that those funds could be used on behalf of the beneficiaries. In this case, the Court finds that the plaintiffs have established that the defendants failed to adequately fund their respective Plans. Also, the proof reveals that the trustees failed to enforce their respective agencies' contractual obligations to adequately fund the Plan.

With respect to damages to be assessed for violations of section 515, section 502(g)(2) sets forth a specific formula for determining awards in actions against employers such as the three corporate defendants, involving delinquent contributions:

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, *and*

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

29 U.S.C. § 1132(g)(2) (emphasis added).

While this section delineates the method for fixing damages for this violation, the specific unpaid contributions have not been established. Although the plaintiffs maintain that the CAAIG reserves were reduced from $1,088,340 in 1995 to $474,924 in 1996; to $373,054 in 1997; and to

$335,298 thereafter until the reserves were depleted in March 2001 (Plfs. Ex. 5), the reduction in reserves does not necessarily correspond to the measure of contributions that were due under the Trust Agreement. Further, the parties fail to address the damages to be assessed against Kearse on this cause of action. Accordingly, the Court deems it necessary to conduct a hearing on damages stemming from the defendants' failure to make necessary contributions to fund the plan.

(C) *As to the Defendants' Failure to Collect the Delinquent Contributions from EOC Suffolk.*

█ The plaintiffs contend that the defendants improperly failed to collect delinquent contributions from EOC Suffolk. At the trial it was revealed that the "working papers" of Mitchell Titus LLP, the certified public accountant employed by CAAIG, showed that, for the Plan year which ended August 31, 1996, there was an "Accounts Receivable" due and owing from EOC Suffolk to CAAIG in the sum of $9,000. EOC Suffolk withdrew from the Plan on June 30, 1998. At the time of its voluntary withdrawal, it owed $9,000 to the Plan, which remains unpaid. Despite this outstanding delinquency the Plan continued to cover the claims of the employees of EOC Suffolk during the years it remained in the Plan. The Court finds that the defendants' failure to collect the delinquent contributions from EOC Suffolk was a breach of their fiduciary duty to administer the Plan solely in the interest of its participants. In *Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984), the Court held that there is imposed on fiduciaries "an unwavering duty . . . to make decisions with single minded devotion to a plan's participants and beneficiaries. . . ."

Further, by failing to recover this money, the defendants violated the Prohibited Transactions provisions set forth in 29 U.S.C. § 1106, for causing the Plan to extend credit to a party in interest. Also, in doing so, the defendants violated the provisions of 29 U.S.C. § 1104(a)(1) by failing to insure that the Plan received all the funds to which it was entitled. In addition, the defendants violated the provisions of 29 U.S.C. § 1104(a)(1)(D) by their failure to terminate EOC Suffolk, as is required under the CAAIG Health Coverage Plan, statement of Participants Rights, under the designation of "Premiums." (*See* Plfs. Ex. 13 at p. 16).

Although EOC Suffolk did not make all the premiums required—to the tune of $9,000 worth of premiums—contrary to the terms of the CAAIG Health Coverage Plan, coverage for EOC Suffolk was not terminated. The plaintiffs have established that this was a violation of ERISA's requirement that fiduciaries act in accordance with the Plan documents, 29 U.S.C. § 1104(a)(1)(D), and also constituted a breach of fiduciary duty.

On this claim, the Court finds that all defendants, including the late John L. Kearse, are jointly and severally liable for the $9,000 plus pre-judgment interest running from June 30, 1998 to the date of the judgment.

(D) *As to the Unjust Enrichment Claims*

█ The plaintiffs raise two claims against the defendant agencies for unjust enrichment. The first claim alleges that the defendants have been unjustly enriched in that the L.I. Head Start Class reserve monies were used to pay benefits to the employees of the defendant agencies. The second claim is a derivative action by the class representative, Paul Adams, on behalf of CAAIG, alleging that the defendants were unjustly enriched by the diversion of the class reserve monies that were used to pay the benefits of the employees of the defendant agencies.

■ As stated in the Court's prior June 3, 2008 interim decision:

> Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he or she must establish that (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances are such that in equity and good conscience, the defendants should return the money or property to the plaintiff. *Beth Israel Medical Center v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 586 (2d Cir.2006); *Golden Pacific Bancorp v. Federal Deposit Insurance Corp.*, 273 F.3d 509, 519 (2d Cir.2001); *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir.1986) (applying New York law). The third factor is critical, and the plaintiffs' must show that "as between the two parties to the transaction the enrichment is unjust." *McGrath v. Hilding*, 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 605 [363 N.E.2d 328 (1977)].

■ This rule of law was recently reiterated by the Second Circuit in *Giordano v. Thomson*, 564 F.3d 163, 169 (2d Cir. 2009):

> "Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant." *Golden Pac. Bancorp. v. FDIC*, 375 F.3d 196, 203 n. 8 (2d Cir. 2004).

The Court further ruled, in the interim decision, that, applying the six-year limitation period, all unjust enrichment claims based on events which occurred prior to December 1, 1994, are barred by the statute of limitations and must be dismissed.

With regard to the third factor, in its interim June 3, 2008 decision, the Court stated:

The plaintiffs' unjust enrichment claim also appears to fail on the merits with regard to the third prong. It may not have been against equity and good conscience for the CAAIG Fund to have used the monies from the so-called "Class Reserve" to pay benefits to the employees of the defendants. At that time, certainly, there were no such legal prohibitions.

The defendant EOC of Suffolk contends that the plaintiffs cannot recover against it on the unjust enrichment causes of action because, the plaintiffs "failed to offer any evidence regarding the amount of payments made by CAAIG from 1992 to 1998 for EOC of Suffolk employees." (EOC of Suffolk Post–Trial Brief at 5). Initially, the Court notes that, as stated above, all unjust enrichment claims based on events that occurred prior to December 1, 1994, are barred by the statute of limitations. Therefore, as to the defendant EOC Suffolk, the only viable claim for unjust enrichment are the amount of payments made by CAAIG to EOC Suffolk between December 2, 1994 to July 30, 1998, when it withdrew from CAAIG. However, the Court agrees that the plaintiffs have failed to offer any evidence to establish the amount of payments made by CAAIG to EOC Suffolk employees from December 2, 1994 to July 30, 1998.

The plaintiffs further contend that the prior action was filed on April 1, 1993, and was brought to recover the reserves, attributable to L.I. Head Start's prior contributions. According to the plaintiffs, by the filing of this action, the defendants in the present action "had actual knowledge that on April 1, 1993, there may be a legal prohibition if they decide to use the L.I. Head Start reserve to pay benefits to the employees of the defendant agencies." (*See* the Plaintiffs' Post–Trial Brief at p. 19). However, the Court has already ruled that there was no violation by the

use of the L.I. Head Start reserves by the participating agencies.

In addition, with regard to the third prong of the plaintiffs' unjust enrichment claims, the Court finds that it was not against equity and good conscience for the agencies to use money from the L.I. Head Start Class reserves to pay benefits to their own employees. Therefore, the plaintiffs failed to prove an action for unjust enrichment against any of the defendants, and these claims are dismissed.

(E) *As to the Liability of the Estate of John L. Kearse*

■ A discussion of this subject must commence with the ERISA statute governing the personal liability of a trustee who violates his fiduciary duty. The ERISA statute at issue here is 29 U.S.C. § 1109(a), which provides:

§ 1109. Liability for breach of fiduciary duty

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach.

As stated previously, the Court has determined that Kearse violated a number of ERISA statutory requirements and, in so doing, breached his fiduciary duties. Kearse violated his duties by (1) permitting the defendants to fail to make the necessary contributions to adequately fund the Plan; (2) engaging in prohibited transactions between the Plan and parties in interest; and (3) for Kearse's failure to take measures to collect the $9,000 owing to CAAIG from EOC Suffolk, which constitutes a lending of money which is a prohibited transaction. *See* 29 U.S.C. 1106(a)(1)(B). The further legal question at issue is whether his estate is liable for these fiduciary duty breaches by Kearse.

■ In the absence of a "specific directive, federal common law generally determines whether a federal statutory cause of action survives the death of a party." *Hardy v. Kaszycki & Sons Contractors, Inc.*, 842 F.Supp. 713, 718 (S.D.N.Y.1993). Actions that are not penal but are remedial in nature, generally survive. *Khan v. Grotnes Metalforming Systems, Inc.*, 679 F.Supp. 751, 756–57 (N.D.Ill.1988). As stated in *Hardy*, 842 F.Supp. at 718, "It is well established that Congress intended ERISA to be remedial ... Plaintiffs' ERISA claim therefore survives the death of [the trustee]." *See also Duchow v. New York State Teamsters Conference Pension & Retirement Fund*, 691 F.2d 74, 78 (2d Cir.1982) *cert. den.* 461 U.S. 918, 103 S.Ct. 1902, 77 L.Ed.2d 289 (1983); *Khan*, 679 F.Supp. at 756–57; *Commercial Solvents Corp. v. Jasspon*, 92 F.Supp. 20 (S.D.N.Y.1950).

Accordingly, the Estate of John L. Kearse, deceased, is responsible for the claims determined against the decedent in this case.

(F) *As to Enforcement of the Prior Judgment*

The plaintiffs contend that they are entitled to enforce their prior judgment against the debt owed to CAAIG by the other Agencies.

As stated above, the judgment entered in the past action on May 25, 2000 was in the sum of $802,831.57, against John L. Kearse and Alphonso Anderson as Trustees of the Community Action Agencies Insurance Group and Community Action Agencies Insurance Group (CAAIG).

Here, the plaintiffs contend that they are judgment creditors of CAAIG by reason of the judgment previously entered against it. Further, they assert that the defendant agencies in this action are indebted to CAAIG as a result of the various

fiduciary breaches alleged in this case. In this regard, the plaintiffs point to New York CPLR § 5227, made applicable to this action by Fed. R. Cir. P. 69(a)(1). CPLR § 5227, in relevant part, provides:

§ 5227. Payment of debts owed to judgment debtor

Upon a special proceeding commenced by the judgment creditor, against any person who is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor.

To clarify this situation, in this case, the judgment creditors of CAAIG are the plaintiffs as a result of the May 25, 2000 judgment entered against CAAIG and the trustees. The plaintiffs contend that the defendant agencies in this action are indebted to CAAIG in the sum of $497,736, the amount of the L.I. Head Start reserves. Thus, the plaintiffs argue that they are entitled to a directive from the Court, pursuant to CPLR 5227, requiring the agencies to pay to the plaintiffs, who are judgment creditors, the amount of the debt owing to CAAIG by the agencies, namely the sum of $497,736. So that, according to the plaintiffs, they are "entitled to enforce this judgment entered against CAAIG in the prior action, against the debt in the amount of $497,736 due to CAAIG from the defendant agencies" (Plaintiffs' Post–Trial Brief at p. 22).

However, as stated above, the Court has determined that the agencies had a right to use the L.I. Head Start reserves. Therefore, the Court finds that there is no debt owing to CAAIG from the defendant agencies with regard to the plaintiffs' first claim involving the diversion of the reserves.

However, with regard to the plaintiffs' remaining two claims, the Court has determined that the defendants in this action are indebted to the CAAIG Plan for (1) failure to make and ensure the necessary contributions to adequately fund the CAAIG Plan; and (2) failure to collect delinquent contributions from EOC Suffolk in the amount of $9000. CAAIG is in turn indebted to the plaintiffs in the prior action as a result of the May 25, 2000 judgment. Accordingly, upon a proper showing of notice to the judgment debtor CAAIG, of both this action and the petition for collection pursuant to CPLR 5227, the Court will, in its final order of judgment, include a directive that the defendants in this action turn over to the plaintiffs in the prior action, as judgment creditors, sums presently owed pursuant to the May 25, 2000 judgment. *RCA Corp. v. Tucker,* 696 F.Supp. 845, 850 (E.D.N.Y.1988) ("[A]lthough the judgment debtor must be notified of the proceeding, he need not be formally designated as a respondent; and notice to him is sufficient if given by registered or certified mail with return receipt requested." (citing CPLR 5227)).

## VIII. *Conclusions*

The Court makes the following determinations:

1. The plaintiffs failed to establish that defendants EOC Nassau, EOC Suffolk and Yonkers CAP breached their respective fiduciary duties when they diverted the L.I. Head Start reserves to their own purpose and uses, namely, to pay employee benefits and administrative expenses. Accordingly, judgment is rendered in their favor on this claim.

2. The plaintiffs have established, by a preponderance of the evidence, that the defendants EOC Nassau, EOC Suffolk, Yonkers CAP and the Estate of John L. Kearse violated their fiduciary duties un-

der the provisions of ERISA, by failing to make the necessary contributions to adequately fund the CAAIG Plan. The parties shall appear for a damages hearing on this issue on Tuesday, September 8, 2009 at 10:00 a.m. in Courtroom 1020.

3. The plaintiffs have established, by a preponderance of the evidence, that the defendants EOC Nassau, Yonkers CAP and the Estate of John L. Kearse violated their fiduciary duties under the provisions of ERISA in failing to collect the delinquent contributions from EOC Suffolk. Accordingly, judgment is rendered against the defendants EOC Nassau, Yonkers CAP and the Estate of John L. Kearse, in the sum of $9,000, with interest from June 30, 1998 to the date of the judgment.

4. The plaintiffs have failed to establish that the defendants EOC Nassau, EOC Suffolk and Yonkers CAP were unjustly enriched by the diversion of the L.I. Head Start reserves. Accordingly, judgment is rendered in favor of those defendants as to that claim.

**SO ORDERED.**