12-2082-cv
*L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

(Argued: December 19, 2012    Decided: March 13, 2013)

Docket No. 12-2082-cv

_____

L.I. HEAD START CHILD DEVELOPMENT SERVICES, INC., PAUL ADAMS,
derivatively on behalf of Community Action Agencies
Insurance Group and as class representative of all other
persons similarly situated,

*Plaintiffs-Appellees*,

v.

ECONOMIC OPPORTUNITY COMMISSION OF NASSAU COUNTY, INC., ECONOMIC
OPPORTUNITY COUNCIL OF SUFFOLK, INC., YONKERS COMMUNITY ACTION PROGRAM,
INC., JOHN L. KEARSE, STELLA B. KEARSE, Representative of the
Estate of John L. Kearse,

*Defendants-Appellants.*[*]

_____

Before:
        CALABRESI, LYNCH, and CHIN, *Circuit Judges*.

_____

    [*]    The Clerk of Court is directed to amend the official
caption to conform to the above.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Spatt, *J.*), awarding damages against defendants-appellants pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, for breaching their duties as fiduciaries of an employee welfare benefits plan.

AFFIRMED.

_____

ALEXANDER A. MIUCCIO (Gregory J. Spaun, *on the brief*), Welby, Brady & Greenbatt, LLP, White Plains, New York, *for Plaintiffs-Appellees*.

MARK GOIDELL, Law Office of Mark E. Goidell, Amityville, New York, *for Defendants-Appellants*.

_____

CHIN, *Circuit Judge*:

In 2000, in a prior lawsuit, the district court entered judgment in the amount of $497,736, plus interest, attorneys' fees, and costs, against Community Action Agencies Insurance Group ("CAAIG" or the "Plan"), a welfare benefits plan for employees of not-for-profit antipoverty

agencies, and its trustees. The judgment was entered in favor of one of the participating agencies, plaintiff-appellee L.I. Head Start Child Development Services, Inc. ("LIHS"), on account of CAAIG's failure to refund reserves that had been set aside for LIHS after LIHS withdrew from the Plan.

In the present case, LIHS and Paul Adams, derivatively on behalf of CAAIG and as representative of a class of LIHS employees who were Plan participants, sued the administrators of CAAIG, contending that they breached their fiduciary duties to CAAIG under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by failing to ensure that CAAIG had sufficient assets with which to satisfy the judgment. Following a bench trial, the district court agreed and entered judgment against the Plan administrators. The administrators appeal. We affirm.

### STATEMENT OF THE CASE

**A. The Facts**

    **1. CAAIG**

CAAIG was established as an ERISA welfare benefits plan for the purpose of providing "sickness, accident, life, disability and other welfare benefits" for the employees of not-for-profit antipoverty agencies. At all relevant times, the participating employers consisted of Economic Opportunity Commission of Nassau County, Inc. ("EOC Nassau"), Economic Opportunity Council of Suffolk, Inc. ("EOC Suffolk"), Yonkers Community Action Program, Inc. ("Yonkers CAP"), and LIHS.

Pursuant to a trust agreement dated October 4, 1983 (the "Trust Agreement"), the CAAIG Trust Fund (the "Trust") was established to effectuate the purposes of the Plan. Section 2 of the Trust Agreement provided that the participating agencies had authority to administer the Plan. The agencies delegated their authority to their respective chief executive officers, who were to act as trustees (the "Trustees") upon the direction of the agencies.

In exercising their powers and duties, section 3.4 of the Trust Agreement required the Trustees to act "solely in the interest of the plan participants and other persons entitled to benefits [thereunder]," for the exclusive purpose of "providing benefits to participants" and "defraying reasonable expenses of administering the Trust," and "[w]ith the care, skill, prudence, and diligence" of a prudent person in like circumstances.

## 2. *Employer Contributions and The Reserves*

The Trust Agreement required the participating agencies to "make the necessary contributions to provide the benefits expected to become payable under this Trust." According to the CAAIG Health Coverage Plan, the failure of any participating agency to "submit the appropriate premium charge within the grace period of 30 days shall cause coverage for all claims to cease from that month forward." To ensure the financial integrity of the Plan, the Trustees maintained approximately $1 million in reserves (the "Plan Reserves"), which funds were "for [the] security of the plan and could not be distributed to any member while the plan was in existence."

At some point, Yonkers CAP and EOC Suffolk began experiencing difficulty paying their Plan contributions. By 1990, Yonkers CAP owed approximately $100,000 in arrears. Although the Trustees initially terminated Yonkers CAP's participation in the Plan, they reinstated Yonkers CAP on assurances that it would pay down its overdue contributions. After reinstatement, however, Yonkers CAP failed to pay down the contributions in arrears. Similarly, in 1990, EOC Suffolk owed the Plan approximately $38,000 in arrears, but the Trustees permitted it to remain in the Plan and pay down its delinquency on an "as possible" basis.

On September 1, 1992, LIHS withdrew from the Plan and requested the immediate return of the portion of Plan Reserves attributable to its past contributions (the "LIHS Reserves"). The Trustees refused to refund the LIHS Reserves.

3.   *The Prior Action and Depletion of Reserves*

In 1993, LIHS, Anthony Macaluso (Finance Director of LIHS) and Paul Adams (LIHS employee formerly participating in the Plan) commenced a class action against

- 6 -

the Plan and its Trustees, seeking, *inter alia*, a refund of the LIHS Reserves (the "Prior Action").

At a meeting of the Board of Trustees on December 14, 1993, the Trustees discussed the fact that the Prior Action exposed the Plan to a contingent liability of approximately $500,000, the amount of damages sought by LIHS and its employees. At the very same board meeting, the Trustees decided to write off the Yonkers CAP delinquency as bad debt and pay the claims of Yonkers CAP employees using the Plan Reserves.

Over the next several years, the Trustees depleted the Plan Reserves, notwithstanding the approximately $500,000 contingent liability it faced in the Prior Action. In 1995 alone, the Trustees expended $611,000 of the Plan Reserves by recording a loss of approximately $296,000 for the write-off of the Yonkers CAP delinquency plus interest receivable, and by paying more in claims and expenses relative to prior years. The Plan Reserves fell below $1 million for the first time in at least seven years. Despite the quickly declining reserves, however, the Trustees did not increase the contributions due from the

agencies but collected approximately the same amounts as in prior years.

On June 30, 1998, Yonkers CAP and EOC Suffolk withdrew from the Plan, owing $107,496 plus interest and $9,000, respectively.  The Plan ceased operations that year.[1]  Between 1998 and March 2001, the Trustees depleted the Plan Reserves, setting aside only $50,000 for the $500,000 in contingent liability it faced in the Prior Action.  They did not exercise their power, under section 3.2(j) of the Trust Agreement, to "retain any funds or property subject to any dispute."

In 2000, the district court entered judgment in the Prior Action, awarding LIHS and its employees $497,736 for the LIHS Reserves that should have been refunded, plus interest, attorneys' fees, and costs, for a total award of $802,831.57.  The Plan satisfied only a portion of the judgment, leaving over $700,000 plus interest unpaid.

---

[1]    Although the district court found that the Plan had ceased operations in 1998, the record suggests that the Plan was never legally terminated.  The district court declined to make a finding as to whether the Plan was legally terminated.

**B.   *Proceedings Below***

On December 13, 2000, LIHS and Adams commenced the present action, principally asserting claims that EOC Nassau, EOC Suffolk, Yonkers CAP, and John Kearse, Chief Executive Officer of EOC Nassau (collectively, the "Administrators"), breached their fiduciary duties in violation of ERISA §§ 404(a) and 409(a).  In the claims relevant to this appeal, LIHS and the Class alleged that the Administrators breached their fiduciary duties by:  (1) diverting the LIHS Reserves to pay the Plan's claims and expenses (the "Diversion Claim"), (2) failing to adequately fund the Plan through contributions from the agencies (the "Underfunding Claim"), and (3) failing to collect overdue contributions from EOC Suffolk (the "EOC Suffolk Delinquency Claim").[2]

The district court conducted a bench trial on a number of days during the period 2004 to 2007 and issued a

---

[2]   Although the EOC Suffolk Delinquency Claim was initially asserted as a claim under ERISA § 406, which proscribes certain prohibited transactions, the basis for this appeal is the district court's conclusion that the Administrators breached their fiduciary duties in violation of ERISA § 404(a).

series of decisions between 2008 and 2012.[3] The district

court held that, as a preliminary matter, LIHS and the

Class were not collaterally estopped from bringing their

claims because the defendant-agencies were not parties in

the Prior Action, but that certain findings of fact it had

made in the Prior Action would be binding as "law of the

case." *See L.I. Head Start Child Dev. Servs., Inc. v.*

*Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 558 F.

Supp. 2d 378, 406-08 (E.D.N.Y. 2008). The district court

dismissed a number of claims as untimely under the

applicable statute of limitations, ERISA § 413, but found

the Diversion Claim, Underfunding Claim, and the EOC

Suffolk Delinquency Claim timely. *See id.* at 391-406. It

held that LIHS and the Class had standing to sue under

ERISA §§ 502(a)(2) and 515, and that the Administrators

---

[3]    The Administrators' notice of appeal indicates the appeal is from the "final judgment entered in this action on the 25th day of April, 2012, and from each part thereof," which implemented the district court's Memoranda of Decision and Orders entered October 20, 2011 and April 24, 2012, awarding damages and attorneys' fees to LIHS and the Class. In light of Rule 3(c)(4) of the Federal Rules of Appellate Procedure and the issues raised on appeal, we construe this appeal as also being taken from the district court's Memoranda of Decision and Orders entered June 3, 2008, July 8, 2009, May 28, 2010, October 20, 2011, and April 24, 2012.

were fiduciaries within the meaning of ERISA, and thus, subject to liability. *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 634 F. Supp. 2d 290, 298-99 (E.D.N.Y. 2009).

Proceeding to the merits of the three claims it found timely, first, the district court dismissed the Diversion Claim. It reasoned that the Trustees, in refusing to refund the LIHS Reserves, reasonably relied on two trust amendments dated October 6, 1983 and August 7, 1986, which provided that the voluntary withdrawal or termination of any member of the Plan shall result in forfeiture of all monetary participation in the Trust and that the Plan Reserves must remain in the Trust to be used or distributed for Trust purposes. *See id.* at 308-10. The district court held that while the trust amendments were held void in the Prior Action, this ruling in 2000 could not have informed the Trustees' reliance on the amendments in the 1990s when they refused to refund the LIHS Reserves. *See id.*

Second, the district court found that the Administrators breached their duties as to the Underfunding

- 11 -

Claim, *i.e.*, that the agencies failed to make the necessary contributions to adequately fund the Plan, and the Administrators, as fiduciaries, failed to enforce the agencies' contractual obligations to make the contributions. *See id.* at 311-12.

Third, the district court found the Administrators liable for the EOC Suffolk Delinquency Claim, concluding, *inter alia*, that the Administrators breached their fiduciary duties by failing to collect the delinquency and permitting EOC Suffolk to remain in the Plan. *See id.* at 313.

On the parties' subsequent cross-motions for reconsideration, the district court reaffirmed its previous rulings, except to acknowledge that it had erred in relying in part on ERISA § 515 to conclude that the plaintiffs had standing. *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, No. 00 Civ. 7394, 2010 WL 8816299, at *8 (E.D.N.Y. May 28, 2010). The district court nevertheless upheld its previous conclusion that plaintiffs had standing pursuant to § 502(a)(2), an independent basis for standing. *See id.* at *11.

After a full damages hearing, the district court ordered the Administrators to pay $832,945, allocated among the defendant-agencies, plus prejudgment interest.[4] *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 820 F. Supp. 2d 410, 427-28 (E.D.N.Y. 2011). In determining the damages amount, the district court relied on the testimony of plaintiffs' expert witness, Anthony Macaluso, and accepted his assumptions and methodology as reliable. *See id.* at 419, 427. Lastly, the district court awarded $490,807.53 in attorneys' fees to the plaintiffs. *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 865 F. Supp. 2d 284, 297-98 (E.D.N.Y. 2012).

This appeal followed.

### DISCUSSION

On appeal, the Administrators principally argue that: (1) LIHS and the Class lack standing under ERISA

_____

[4] Although the district court held that the Estate of John Kearse was liable for damages attributable to Kearse, it did not specify how much of the total damages amount should be allocated to him.

§ 502(a)(2); (2) the claims are time-barred under ERISA § 413; (3) the agencies are not fiduciaries under ERISA § 3(21)(A); and (4) the Administrators did not breach their fiduciary duties under ERISA § 409(a).  We review the district court's findings of fact after a bench trial for clear error and its conclusions of law *de novo*.  *See United States v. Coppola*, 85 F.3d 1015, 1019 (2d Cir. 1996).

## A.    *Standing*

### 1.    *Applicable Law*

ERISA § 502(a)(2) confers standing on "a participant, beneficiary or fiduciary" to seek relief under ERISA § 409.  29 U.S.C. § 1132(a)(2).  ERISA § 409(a) in turn provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach.

29 U.S.C. § 1109.

"[C]laims [pursuant to § 409(a)] may not be made for individual relief, but instead are 'brought in a representative capacity on behalf of the plan.'"  *Coan v.*

- 14 -

*Kaufman*, 457 F.3d 250, 257 (2d Cir. 2006) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985)). Standing is conferred upon certain classes of plaintiffs whose "common interest . . . is in the financial integrity of the plan" to seek remedies against the "misuse of plan assets." *Russell*, 473 U.S. at 142 & n.9. "[T]he basic standing issue is whether the plaintiff is *within the zone of interests ERISA was intended to protect*." *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 668 (2d Cir. 1994) (citation and internal quotation marks omitted) (emphasis in original).

A "participant" within the meaning of § 502(a)(2) is "any employee or former employee of an employer, . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). "[T]he term participant is naturally read to mean either employees in, or reasonably expected to be in, currently covered employment, or former employees . . . who have a colorable claim to vested benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989) (citations and internal quotation marks omitted). For a claimant to

establish that he or she "may become eligible" for benefits, the claimant "must have a colorable claim that [ ] he or she will prevail in a suit for benefits."  *Id.*

The existence of standing is a question of law we review *de novo*.  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 197 (2d Cir. 2005); *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004) (citation omitted).

## 2. *Application*

First, the Administrators argue that the plaintiffs' claims are not derivative in nature because the relief they seek -- recoupment of losses to the Plan, which may ultimately be used to satisfy the judgment in the Prior Action -- does not inure to the Plan.  We disagree.

The district court found that LIHS and the Class were asserting claims in a derivative capacity for the benefit of the Plan as a whole.  In their verified consolidated amended complaint, the plaintiffs sought recoupment of funds the Trustees should have collected to keep the Plan financially solvent after paying its claims and expenses.  LIHS and the Class asserted these claims on

the Plan's behalf, and prayed for relief inuring to the Plan.  This relief, of course, surely would have benefitted the Plan.  It is of no moment that recovery inuring to the Plan may ultimately benefit particular participants.  *See LaRue v. DeWolff, Boberg & Assocs.*, Inc. 552 U.S. 248, 256 (2008) (ERISA § 502(a)(2) authorizes "recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account"); *accord Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 826 (6th Cir. 2007) ("[T]he fact that damages awarded to the Plan may provide plaintiffs with an indirect benefit, the payment of their claims, does not convert their derivative suit into an action for individual relief.").

Second, the Administrators argue that the members of the Class lack standing because they were seeking only a refund of past contributions rather than asserting a "claim for benefits."  The argument fails, however, because the Class is not asserting a "claim for benefits" under ERISA § 502(a)(1)(B), but rather, a claim for recovery of "losses to the plan" caused by the fiduciaries' breach of duties under ERISA §§ 502(a)(2) and 409(a).  *See LaRue*, 552 U.S.

at 259 (Roberts, *C.J.*, concurring) (distinguishing a "claim for benefits" under § 502(a)(1)(B) from a claim for breach of fiduciary duty under § 502(a)(2)). "Benefits" as used to define "participants" is not limited to plan benefits but encompasses "a benefit of any type." 29 U.S.C. § 1002(7). Furthermore, ERISA §§ 502(a)(2) and 409(a) require a fiduciary who breaches his duties "to make good to [the] plan any losses to the plan resulting from [the] breach, and to restore to such plan any profits [made by the fiduciary through use of plan assets]." *Id.* § 1109(a). Thus, the Class members are "participants."

Section 502(a)(2) confers standing on a "participant" to seek relief under § 409(a). *Id.* § 1132(a)(2). Because the Class members are employees of LIHS entitled to receive "a benefit of any type" from the Plan, they are "participants" with standing under § 502(a)(2).

As to LIHS, the Administrators argue that it lacks standing because it is no longer a fiduciary of the Plan. There is no dispute that LIHS was a fiduciary during its participation in the Plan; rather, the Administrators argue

- 18 -

that LIHS lost its fiduciary status by withdrawing from the Plan.

The Administrators rely on *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 14-15 (2d Cir. 1991), for the proposition that a former fiduciary lacks standing under ERISA § 502(a). The circumstances in *Chemung*, however, are distinguishable. There, we held that a former fiduciary -- whose interests were adverse to those of the plan -- lacked standing where it "no longer [had] an interest in protecting a plan to which it [was] now a complete stranger." *Chemung*, 939 F.2d at 15. Here, far from being a complete stranger to the Plan, the district court found that LIHS had a continuing interest in protecting the Plan assets, which consisted in part of the funds LIHS had contributed to the Plan during its participation. Accordingly, we conclude that LIHS has standing under ERISA § 502(a) as a fiduciary of the Plan. Our conclusion is consistent with ERISA's remedial scheme designed to "remove jurisdictional and procedural obstacles which in the past appear to have hampered effective

enforcement of fiduciary responsibilities."  *Mullins*, 23

F.3d at 668 (quotation omitted).[5]

**B.    *Statute of Limitations***

**1.    *Applicable Law***

ERISA § 413 provides the applicable statute of

limitations for claims asserting a breach of fiduciary

duty:

> the earlier of -- (1) six years after (A) the
> date of the last action which constituted a
> part of the breach or violation, or . . . (2)
> three years after the earliest date on which
> the plaintiff had actual knowledge of the
> breach or violation.

29 U.S.C. § 1113.

Under the three-year limitations period in

subsection (2), actual knowledge is strictly construed and

constructive knowledge will not suffice.  *See Caputo v.*

*Pfizer, Inc.*, 267 F.3d 181, 193-94 (2d Cir. 2001).  "While

---

[5]    We also reject the Administrators' argument that LIHS and the Class lack constitutional standing because they have not suffered an injury-in-fact.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (constitutional standing requires injury-in-fact, causation, and redressability).  As discussed, LIHS and the Class have asserted their claims in a derivative capacity, to recover for injuries to the Plan caused by the Administrators' breach of their fiduciary duties.  This is injury-in-fact sufficient for constitutional standing.

a plaintiff need not have knowledge of the relevant law, he must have knowledge of all facts necessary to constitute a claim." *Id.* at 193 (internal citation omitted).

"We review the question of the application of the relevant statute of limitations . . . *de novo*." *Novella v. Westchester Cnty.*, 661 F.3d 128, 143 (2d Cir. 2011).

### 2. *Application*

#### a. *Underfunding Claim*

The Administrators argue that the Underfunding Claim is time-barred under the three-year limitations period because counsel for LIHS and the Class, Alexander Miuccio, acquired actual knowledge of the relevant facts sometime between 1993 and 1996 during discovery in the Prior Action, and such knowledge should be attributed to his clients based on their agency relationship.

The district court held that any actual knowledge Miuccio possessed should not be imputed to LIHS and the Class because this is a class action, relying on *Stieberger v. Sullivan*, 738 F. Supp. 716 (S.D.N.Y. 1990), *Schwab v. Philip Morris USA, Inc.*, No 04 Civ. 1945, 2005 WL 2467766 (E.D.N.Y. Oct. 6, 2005), and *Crimi v. PAS Industries, Inc.*,

- 21 -

No. 93 Civ. 6394, 1995 WL 272580 (S.D.N.Y. May 9, 1995), where knowledge was not imputed in class action contexts because the large number of plaintiffs often rendered the attorney-client relationship more tenuous.

We conclude that the three-year limitations period does not bar the Underfunding Claim. Even assuming Miuccio's knowledge can be attributed to LIHS and the Class, he did not possess all of the material facts giving rise to the Underfunding Claim. Miuccio conceded before the district court that during the Prior Action, he acquired knowledge of the facts giving rise to the Diversion Claim and the EOC Suffolk Delinquency Claim. As to the Underfunding Claim, however, he repeatedly represented that it was not until sometime between 2000 and 2004 -- when he received the Plan's financial statements during supplemental proceedings following entry of judgment in the Prior Action -- that he learned that the Plan was underfunded and the Administrators could have breached their fiduciary duties in this regard. The district court accepted this representation, and we have no basis to

second-guess that decision.[6]  This action was commenced on

December 13, 2000, within three years of the time Miuccio

learned all of the material facts giving rise to the

Underfunding Claim.[7]

Alternatively, the Administrators argue that the

Underfunding Claim is barred by the six-year limitations

period because it accrued on September 1, 1992, when LIHS

learned that the LIHS Reserves would not be refunded.  The

district court, however, found that the Administrators'

failure to adequately fund the Plan occurred between 1995

and March 2001, a finding that is not clearly erroneous.

The district court reasonably distinguished between the

earlier failure to refund money contributed by LIHS and the

_____

[6]     The district court referred to "diversion" in
discussing both the Diversion Claim and the Underfunding Claim.
Based on our reading of the district court's decisions and the
record as a whole, we understand Miuccio's representations to
relate only to the Underfunding Claim.

[7]     The Administrators offer an alternate basis for the
application of the three-year bar.  They argue that Macaluso and
Phyllis Simmons (former Chief Executive Officer of LIHS) knew
sometime between 1993 and 1995 that the Plan would not refund
the LIHS Reserves, and that is when the limitations period began
to run.  This argument fails.  The fact purportedly known by
Macaluso and Simmons relate to the Diversion Claim, not to the
Underfunding Claim.  Moreover, any knowledge possessed by
Macaluso in the Prior Action cannot be attributed to the Class
in this case, of which he is not a member.

subsequent, distinct decision not to increase contributions to the fund to maintain adequate reserves to cover the contingent liability represented by LIHS's Prior Action to recover that money.

The six-year limitations period runs from the "date of the *last action* which constituted a part of the breach."  29 U.S.C. § 1113(1)(A) (emphasis added).  Because the last action constituting the Administrators' failure to adequately fund the Plan occurred in March 2001, and this action was commenced on December 13, 2000, the Underfunding Claim is timely.

### b.  *EOC Suffolk Delinquency Claim*

The Administrators argue that the EOC Suffolk Delinquency Claim accrued in 1990, and that, therefore, it is barred by the six-year limitations period.  As discussed above, the six-year limitations period runs from the date of the last action constituting a part of the breach.  The district court found that the Trustees' failure to collect EOC Suffolk's delinquency continued until at least August 31, 1996, when $9,000 still remained on the Plan's books.

Thus, the EOC Suffolk Delinquency Claim is timely under the six-year limitations period.[8]

C.   *Fiduciary Status of the Agencies*

    1.   *Applicable Law*

    ERISA § 3(21)(A) imposes fiduciary status on (1) "those who exercise discretionary authority [with regard to the management or administration of the plan], regardless of whether such authority was ever granted" and (2) those "who have actually been granted discretionary authority, regardless of whether such authority is ever exercised." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006) (citation and internal quotation marks omitted).

    We review *de novo* the question of whether a party is an ERISA fiduciary.  *See LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997).

_____

[8]     As the Administrators have not developed an argument in their briefs that the EOC Suffolk Delinquency Claim is barred by the three-year limitations period, they have waived any such argument.  *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).  Furthermore, we do not reach the Administrators' argument that the Diversion Claim is time-barred because we affirm the district court's judgment on the basis of the Underfunding and EOC Suffolk Delinquency Claims, as explained below.

- 25 -

## 2. *Application*

The agencies argue that they are not fiduciaries of the Plan because the Trust Agreement assigned only ministerial functions to them and assigned discretionary authority to the Trustees. We reject this argument. The district court correctly found that the Trust Agreement granted the agencies ultimate discretionary authority to administer the Plan. Section 2 of the Trust Agreement expressly provided that the Plan would be administered by the agencies, and that the Trustees would act upon the agencies' direction. Even if the agencies never exercised this discretion, the Trust Agreement's grant of actual discretionary authority to them is sufficient to find that the agencies are fiduciaries under ERISA § 3(21)(A). *See Bouboulis*, 442 F.3d at 63.

## D. *Breach of Fiduciary Duty*

### 1. *Applicable Law*

ERISA § 409(a) imposes liability on a fiduciary who breaches his duties under ERISA § 404(a)(1), which requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and

- 26 -

beneficiaries and (a) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" with the care, skill, prudence, and diligence of a prudent man under similar circumstances and in accordance with the documents and instruments governing the plan. 29 U.S.C. § 1104(a). Under ERISA § 405, a fiduciary "shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" in certain circumstances. *Id.* § 1105. The Administrators concede that the breach of a contractual obligation in the Plan documents constitutes a breach of their fiduciary duties under § 404(a)(1).

### 2. *Application*

We conclude that the Administrators breached their fiduciary duties with respect to the Underfunding Claim. The district court found that the Plan was underfunded. This finding of fact was not clearly erroneous. The district court found that beginning in 1995, the Plan lacked sufficient funds to pay its claims and expenses. The court accepted expert testimony from Macaluso that the

- 27 -

judgment in the Prior Action was an administrative expense of the Plan. This testimony accurately reflected the law. A plan must pay its legitimate liabilities. Payments to satisfy judgments for expenses incurred or debts owed by the Plan are appropriately considered administrative expenses of the Plan. The district court thus correctly rejected the Administrators' contention that all of the Plan's claims and expenses were paid throughout its existence, and instead, concluded that the Administrators were obliged to increase the contributions due from the agencies.

Section 3.1 of the Trust Agreement required the agencies to "make the necessary contributions to provide the benefits expected to become payable under this Trust." The agencies failed to make the necessary contributions due to the Plan, thus violating the Trust Agreement. Similarly, the Administrators had a fiduciary duty to ensure that the agencies satisfied their payment obligations to the Plan. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 916 (2d Cir. 1989) ("Under ERISA, trustees have a fiduciary duty to 'act to ensure

that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries.'" (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571 (1985))); *Frulla v. CRA Holdings, Inc.*, 596 F. Supp. 2d 275, 284 (D. Conn. 2009) (fiduciaries have an obligation to ensure that plan sponsors satisfy their funding obligations to the plan).

Third, the Administrators violated section 3.4 of the Trust Agreement, which required them to discharge their fiduciary duties for the exclusive purpose of providing benefits and "defraying reasonable expenses of administering the Trust." During the same board meeting at which they discussed the $500,000 contingent liability in the Prior Action, the Trustees decided to use the Plan Reserves to write off a delinquency owed by Yonkers CAP and to pay the claims of Yonkers CAP employees. Although the Trustees had the power to "retain any funds or property subject to any dispute," as provided in section 3.2(j) of the Trust Agreement, they failed to retain enough funds to

cover the $500,000 contingent liability, setting aside only $50,000.

Between 1993, when the Prior Action was commenced, and March 2001, the Trustees dissipated the Plan Reserves, allowing the reserves to fall below $1 million and eventually depleting the funds altogether. At the same time, they failed to increase the contributions payable by the agencies to replenish the Plan Reserves and ensure the financial integrity of the Plan. Even following the entry of the $802,831.57 judgment in the Prior Action, the agencies failed to fulfill their obligation to make adequate contributions, and the Administrators as fiduciaries failed to enforce the agencies' contractual obligations to do so, consequently leaving the judgment unsatisfied. Accordingly, we agree with the district court that the Administrators breached their fiduciary duties with respect to the Underfunding Claim.[9]

---

[9] The Administrators argue that Kearse's liability should be limited to breaches having occurred prior to October 5, 1996, when he resigned as trustee. We reject this argument, as the parties jointly stipulated that Kearse continued acting as a fiduciary until June 30, 1998, by which time the fiduciary breaches had already occurred. The parties also stipulated that the Trustees had delegated their authority to administer and

As to the EOC Suffolk Delinquency Claim, the district court found that the CAAIG Health Coverage Plan required the Administrators to terminate EOC Suffolk from the Plan upon its failure to pay its contributions within the thirty-day grace period.  The district court concluded that by failing to collect the delinquency and permitting EOC Suffolk to remain in the Plan without meeting its obligations, the Administrators breached their duties to administer the Plan in accordance with plan documents and act solely in the interest of plan participants and beneficiaries.  We agree.  *See Diduck*, 874 F.2d at 916 (trustees have a fiduciary duty to ensure that a plan receives all funds to which it is entitled).

The Administrators argue that the Trustees could have reasonably concluded that the cost of pursuing the $9,000 debt was not justified.  They offer no evidence, however, that the Trustees actually weighed the costs and benefits of pursuing the debt and made a considered decision in this regard.  Moreover, they cannot dispute

operate the Plan to Kearse.  Therefore, Kearse's liability is not limited, and we affirm the district court's judgment in that regard.

- 31 -

that the Trustees could have terminated EOC Suffolk from the Plan before it elected to withdraw in 1998, thereby mitigating further losses to the Plan caused by EOC Suffolk's participation. Accordingly, we conclude that the Administrators breached their fiduciary duties with respect to the EOC Suffolk Delinquency Claim.[10]

### CONCLUSION

Accordingly, the judgment of the district court is **AFFIRMED.**

_____

[10] As to the Administrators' remaining arguments that their fiduciary duty breaches did not cause a loss to the Plan, the amount of damages was not established with reasonable certainty, the agencies could not satisfy a judgment using funds obtained through government grants, and the district court erred in awarding attorneys' fees, we affirm for substantially the reasons set forth by the district court in its Memoranda of Decision and Orders entered October 20, 2011 and April 24, 2012. *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 865 F. Supp. 2d 284 (E.D.N.Y. 2012); *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 820 F. Supp. 2d 410 (E.D.N.Y. 2011).